UNITED STATES DISTRICT COURT        FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
RAPHAEL GENAO,

                Plaintiff,                MEMORANDUM AND ORDER
                                                    04 CV 2893 (JG)

   -against-

NEW YORK CITY DEPARTMENT OF PARKS
AND RECREATION,

                Defendant.
-------------------------------------------------------------------x
A P P E A R A N C E S:

    RAPHAEL GENAO, *pro se*
        144-77 41st Avenue - Apt. 419
        Flushing, N.Y. 11355

    MICHAEL A. CARDOZO
        Corporation Counsel
            of the City of New York
        100 Church Street, Room 2-169
        New York, New York 10007
    By:    David S. Levine
        Assistant Corporation Counsel
        Attorney for Defendant.


JOHN GLEESON, United States District Judge:

        Plaintiff Rafael Genao brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. ¶ 2000e *et seq*., alleging discrimination based on race, religion, national origin, as well as retaliation. Defendant New York City Department of Parks and Recreation ("the Parks Department" or "the Department") moves to dismiss the complaint on the grounds that (1) the claims are untimely; (2) Genao has failed to state a claim upon which relief can be granted, warranting dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6); and (3) the

Parks Department is not a suable entity.[1]

For the reasons set forth below, the motion to dismiss is granted.

BACKGROUND

The following facts are relevant for the purposes of this motion. I assume that all of the below facts are true, as I must in deciding this motion. *See Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995).[2]

Rafael Genao has worked for the Parks Department since 1993. For the past three or four years, he has worked as a seasonal city parks worker ("CPW"). Usually, he works from mid-March until late September or October.

In September 2001, Genao's brother, Saifullah As Salaam, filed a claim of discrimination against the Parks Department with the EEOC. Sometime earlier, Salaam had found a hangman's noose hanging from a Parks Department truck. On about November 19, 2001, Salaam was terminated from his position as a climber and pruner for the Parks Department and

---

[1] While the Parks Department is not a suable entity under New York City's Charter, *see, e.g.*, *Farrel v. Child Welfare Admin.*, 77 F. Supp. 2d 329, 330 n.3 (E.D.N.Y. 1999), I construe Genao's claim as one against the City of New York. *Id.* (treating *pro se* plaintiff's claim against an agency as a claim against the City).

Genao is a *pro se* plaintiff, and I have liberally construed his complaint and affidavits. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (explaining that *pro se* complaints are held to less stringent standards). Indeed, a court must interpret *pro se* pleadings "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation omitted). Nonetheless, a *pro se* plaintiff is not exempt from compliance with relevant rules of procedural and substantive law. *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

[2] On November 12, 2004, I heard oral argument on the Parks Department's initial motion to dismiss. At the argument, Genao elaborated on his complaint, which until that point was vague, and arguably inscrutable. In lieu of having Genao file an amended complaint, the transcript of the argument was incorporated as a supplement to the complaint. See Def. Ex. A, Transcript of Motion Hearing, November 12, 2004 (hereinafter "Tr.").

reassigned (presumably to the position of Assistant Gardener).³ The reason given by the Parks Department for Salaam's reassignment was that Salaam "disobeyed a direct order." (Tr. at 16.) Genao alleges, however, that his brother was reassigned in retaliation for leaving pictures of the noose and "certain scriptures" on the desk of Parks Department personnel. (Tr. at 7, 16.)

The crux of Genao's claim in this action is that he and his brother are being retaliated against by the Parks Department because of Salaam's filing of a discrimination claim.⁴ In addition, Genao alleges that he will be discriminated against by the Department because he shares the same religious beliefs as his brother: "[Both Salaam] and I have the same religion, we have the same beliefs, and if he's going to be fired for misconduct, for his religious beliefs, th[en] how am I not to believe that I am going to be retaliated against? I have the same beliefs that he does." (Tr. at 16.)

A.  The Alleged Acts of Discrimination

Genao alleges three acts of retaliation against him based on his brother's actions.

1.  Use of Leave in 2002

In March 2002, Genao was hired as a CPW for Rego Park. Dominick Anastasio was his supervisor. Throughout the season, Genao would ask Anastasio for certain days off. (Tr. at 6.) Anastasio told Genao that if he needed additional days off, he could use personal leave or sick days that were available to him. At the time, Genao thought that Anastasio was just being

---

³ Genao's brother was terminated from his position as a climber and pruner on November 16, 2001, and was reassigned to another position beginning on November 19, 2001. Compl. Ex. B. By letter dated July 4, 2003, entitled "Three Weeks Notice," Genao's brother notified the Department of his intention to resign from the position of Assistant Gardener because of "irreconcilable differences between the department and [himself] over a pending lawsuit for discrimination and retaliation." Compl. Ex. B.

⁴ Salaam's discrimination claim is currently pending in this district. *See Salaam v. New York City Department of Parks and Recreation*, 02-cv-5646 (DLI).

cool, and Genao used up three or four of his sick days based on what Anastasio told him. Later, however, Genao became suspicious, in part because Anastasio told Genao, while looking at Genao's paycheck, that he wanted to see how much sick-time Genao had left because he wanted to make sure that Genao did not lose the time when the job finished. Genao asked a coworker if Anastasio had ever made such a remark to him, and his coworker told him that he had not. Genao alleges that subsequently, the Parks Department did not hire him as a permanent (as opposed to seasonal) worker because he had taken those three or four sick days. (Tr. at 8.) The Department never stated that the reason it did not hire Genao as a permanent worker was because he took those days off, but Genao asserts, "I know I didn't get hired." (Tr. at 8.) In short, Genao believes that Anastasio set him up, i.e. he lulled Genao into believing that it was alright to use sick days, intending all along to sabotage Genao's opportunity to be hired as a permanent worker. Genao's suspicion stems in part from his sense that Anastasio behaved nicely towards him. (Tr. at 9.)

2. The Hiring in 2003

In 2003, Genao expected to hear from the Parks Department, as he usually did, around mid-to late March regarding where and when he should report to work for the upcoming season. However, he was not contacted by the Department. Around May 16, Genao went to see Joyce Melnick, the Department's Chief of Administrative Services for Queens. According to Genao, Melnick "just happened to be the same person that was hand delivered a copy of a particular truth along with pictures of a hangman's noose displayed on the back of a Departments [*sic*] forestry vehicle." (Compl. ¶ 5.)[5] Melnick informed Genao that the Department had not

---

[5] I understand this to mean that Melnick is alleged to be one recipient of the paper bearing scripture and a picture of a noose, which apparently led to Genao's brother's reassignment in

4

contacted Genao because Genao had changed his phone number. When Genao asked Melnick why he had not been contacted by mail, Melnick told him that the Department contacted seasonal employees by phone, and not through the mail. Melnick then told him that there were only seven weeks left in the 2003 season for seasonal employees, that is, that the seasonal jobs would end on June 30. (Pl.'s Aff. at 2.) When Genao expressed his interest in such a position despite the short time frame, Melnick told him that no jobs were available, but that the Department would contact him if anything came up.

In approximately mid-July, Genao bumped into Jim Cafaro, a former manager. At that time, Genao had heard nothing from the Parks Department regarding the availability of a job. Cafaro told Genao that the seasonal positions had been extended until mid-September, and that he needed workers. Cafaro arranged for Genao to be hired by the Department, and Genao worked from around July 20 to around September 3, 2003.

        3.        The Request to Work Additional Weeks in 2003

As mentioned above, Genao did not commence working in 2003 until late July. That "line" of work was to end seven weeks later. Genao asked Cafaro if he could work another fourteen weeks so he could become eligible for unemployment benefits. Cafaro laughed at him:

> I had talked to [Cafaro], and I ask him if it was possible for him to get me the 14 weeks that I had missed in the beginning, if he can have me extended for 14 weeks, so I might be able to at the end of the 14 weeks collect unemployment which is how I was supporting myself. He started – he laughed at me. He said you lucky to have the seven weeks that you got when I bumped into you at the beach. You were a bum. I gave you a job. So, you know, I said, okay, whatever. So this ends the season of 2003.

Tr. at 12.

---

2001.

B.   Genao's Complaints

On October 7, 2003, Genao filed a grievance with his union, Local 1515, alleging that Parks Department officials retaliated against him because of his brother's complaints of discrimination by encouraging Genao to use up sick time in 2002, and failing to timely notify him of seasonal work in 2003.

On November 19, 2003, Genao gave testimony before the Equal Employment Practices Commission at a public hearing on discrimination complaints filed by New York City employees. The following day, he called the EEOC. On November 26, 2003, Genao received a call from Lesley Webster (presumably an EEOC employee), and Genao told Webster that he believed that he had been discriminated against by the Parks Department. Webster told Genao that she would investigate his claim. Genao believes that this telephone call was the equivalent of filing a written complaint with the EEOC. On December 12, 2003, Webster called Genao and told him that the reason Genao had not been informed when to report to work in 2003 was because the Parks Department did not have his telephone number and that the Department did not contact seasonal employees by mail to notify them of work.

On March 31, 2004, Genao filed a charge of discrimination with the EEOC against the Parks Department, alleging discrimination based upon race, religion, and national origin, as well as retaliation because of his "brother's actions in raising concerns about racism in the department."[6] On April 20, 2004, Genao received a right-to-sue letter from the EEOC, and he brought this action on July 7, 2004. On November 12, 2004, oral argument was held on

---

[6]   The precise date on which the EEOC charge was filed is unclear. However, Genao signed it on March 31, 2004, so for the purposes of the limitations period, that is deemed to be the filing date.

6

defendant's first motion to dismiss. At that appearance, Genao clarified his complaint. He also clarified the relief he is seeking, which includes: (1) an order installing him in a full-time supervisory position with time off for religious observance, specifically the months of December and February, a week in July, and a week in August; (2) exemption from city, state, and federal taxes until his brother's employment records are changed and "misconduct" is no longer is given as the reason for his "termination"[7]; and (3) the resignation of Joyce Melnick from a position of authority.

## DISCUSSION

A.  The Standard for a Motion to Dismiss Under Rule 12(b)(6)

Dismissal under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992) (quotation marks omitted). A federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The appropriate inquiry is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.*; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.").

---

[7]  Genao's brother was not terminated by the Parks Department. He resigned by letter dated July 4, 2003. *See* Compl. Ex. B.

B.     The Timeliness of Genao's Claims

A plaintiff alleging discrimination under Title VII must first file a charge with the EEOC within 300 days after the allegedly discriminatory act occurred. 42 U.S.C. § 2000e-5(e); *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 76 (2d Cir. 2003). A claim accrues when the employee is given notice of the employer's allegedly discriminatory decision. *See Economu v. Borg-Warner Corp.*, 829 F.2d 311, 315 (2d Cir. 1987) (explaining that the limitation period commences on the date the allegedly discriminatory decision "was made and communicated to the employee") (quoting *Delaware State College v. Ricks*, 449 U.S. 250 (1980)) (brackets omitted); *cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (a discrete retaliatory or discriminatory act "'occurred' on the day that it 'happened.'"). Discrete discriminatory acts are not actionable if time-barred, even if they relate to acts that are within the limitations period. *Id.* at 113. The limitations period is subject to equitable tolling or estoppel. *See id.*; *Zerilli-Edelglass*, 333 F.3d at 80.

Here, Genao's EEOC charge was filed on March 31, 2004.[8] Thus, any alleged acts that occurred prior to June 5, 2003 are time-barred unless equitable tolling is appropriate. At oral argument, Genao contended that the limitations period should be tolled because (a) he is a seasonal worker; and (b) it was not until he received a letter inviting him to work in 2004 that he had proof that he was discriminated against in 2003. I reject both arguments.

---

[8]     Genao asserts that he spoke by telephone to an EEOC employee on November 26, 2003 about his claim of discrimination, and that he believed that this contact constituted the filing of an official complaint. Under Title VII, however, the date of filing with the EEOC is the date that a complainant reduces his complaint to writing. *See* 29 C.F.R. § 1601.12 (an EEOC charge "is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.").

8

Equitable tolling is appropriate only in "rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising his rights." *Zerilli-Edelglass*, 333 F.3d at 80 (quotation marks and brackets omitted); *cf. National Railroad*, 536 U.S. at 113 ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.") (quoting *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 (1984)).

A seasonal employee alleging discrimination need not, and often cannot wait until his employment cycle begins again to file a discrimination claim with the EEOC. An employee's status as a seasonal worker has no bearing on his ability to file a claim of discrimination with the EEOC or the limitations period that attaches under Title VII. Nor is the limitations period tolled while an employee waits for evidence of discrimination. Such a rule would eviscerate the purpose of the limitations period. *See Nat'l R.R.,* 536 U.S. at 109 ("by choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination.") (internal quotation and brackets omitted).[1] Accordingly, any discrete claim of discrimination or retaliation that occurred prior to June 5, 2003 is time-barred.

Genao has alleged the following acts of discrimination: (1) that his supervisor tricked him into using three or four sick-days, which prevented him from securing a permanent position with the Department (September 2002); (2) that the Department failed to notify him of

---

[1] Genao's argument that he needed to wait until 2004 (when he received a letter inviting him back to work) for proof that he had been discriminated against in 2003 (when he did not receive a letter) is undermined by his contention at oral argument that he had received a letter from the Parks Department inviting him back to work in every year except for 2003.

upcoming work for the 2003 season (March 2003); (3) that Melnick, the Department's Chief of Administrative Services, told him that (a) the reason Genao had not been notified of work for the summer of 2003 was that he had changed his telephone number, and the Department did not notify seasonal workers by mail; and (b) there were only seven weeks left in the season, and when Genao expressed interest, said that no such jobs were available (May 2003); (4) that despite giving his telephone number to Melnick, Genao found out that there was work available only by fortuitously bumping into a former manager, who then arranged for Genao to be hired (July 2003); and (5) that Genao requested that he be allowed to work for an additional fourteen weeks, but was harshly rebuffed by Jim Cafaro, the former manager (August or September 2003). The events occurring prior to June 5, 2003 ((1) through (3) above) are time-barred, and any discrete claims grounded in these events are dismissed.

Genao argues that his untimely claims may be considered as components of a timely hostile work environment claim. *See Nat'l Railroad*, 536 U.S. at 106 ("consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period"). Genao has not, however, stated a hostile work environment claim. A hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Id.* at 116 (internal quotations omitted). Nothing in Genao's papers suggests that he was subject to such an environment. Indeed, Genao makes no allegations whatsoever about the conditions of his employment. His allegations focus on such things as the

10

failure to notify him about work; the failure to hire him as a permanent employee; and a supervisor's allegedly duping him into using sick days that affected his chances of getting a permanent job. These are allegations of discrete acts. *Cf. id.* at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.").

C. The Merits of Genao's Timely Claims

Genao has alleged two acts of discrimination that occurred after June 5, 2003: Melnick's failure to call Genao when seasonal work was extended beyond June 30; and Cafaro's refusal to allow Genao to extend the term of his employment in the fall of 2003 by fourteen weeks. These allegations fail to state a claim of racial, religious, or national origin discrimination or a claim of retaliation under Title VII.

1. Third-party Retaliation Claims

As a threshold matter, the Parks Department suggested in its papers that Genao may not be able to state a claim of retaliation because it was his brother, and not Genao, who engaged in the protected activity. Br. at 10. At oral argument, however, the Department apparently backed away from that proposition.

Congress expressly prohibited retaliation in Title VII, providing that it is an "unlawful employment practice" for an employer to retaliate against an employee because he has "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]" 42 U.S.C § 2000e-3(a). The statute does not address the situation where the alleged retaliation is directed at someone other than the employee who has complained of discrimination.

Although the Second Circuit has not addressed the question of third-party retaliation claims under Title VII, *see Gonzalez* v. *New York State Dep't of Correctional Servs.*, 122 F. Supp. 2d, 335, 346-47 (N.D.N.Y. 2000), several other courts of appeals have held that retaliation against a person who has not himself engaged in protected conduct is not actionable. *See Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir. 1998) (a plaintiff bringing a retaliation claim under Title VII must establish that she personally engaged in the protected conduct); *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 570 (3d Cir. 2002), *cert. denied*, 537 U.S. 824 (2002), (the plain language of the retaliation provisions of the ADA and ADEA (which are similar to the retaliation provision of Title VII) permit only the person engaged in the protected activity to make a retaliation claim); *Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1227 (5th Cir. 1996) (ADEA). As the Third Circuit noted in *Fogelman*, though, there is a conflict between the plain language of the anti-retaliation provisions and the policies animating those provisions: "[t]here can be no doubt that an employer who retaliates against the friends and relatives of employees who initiate anti-discrimination proceedings will deter employees from exercising their protected rights." *Fogelman*, 283 F. 3d at 569. This conflict has led other courts of appeals, district courts (including courts in this circuit), and the EEOC to conclude that the anti-retaliation provision of Title VII prohibits retaliation against a third-party. *See E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 543 (6th Cir. 1993) (quoting with approval the rationale set forth in *DeMedina v. Reinhardt*, 444 F. Supp. 573 (D.C. 1978), *aff'd in relevant part*, 686 F.2d 997 (D.D.C. Cir. 1982) ("Congress unmistakably intended to ensure that no person would be deterred from exercising his rights under Title VII by the threat of discriminatory retaliation . . . [and] tolerance of third-party reprisals would, no less than the tolerance of direct reprisals, deter

12

persons from exercising their protected rights under Title VII."); *Gonzalez,* 122 F. Supp. 2d 335, 346-47 (N.D.N.Y.) (allowing an employer to retaliate against the spouse of an employee engaged in protected activity would provide a means to circumvent Title VII's remedial scheme); *Murphy v. Cadillac Rubber & Plastics*, *Inc.*, 946 F. Supp. 1108, 1118 (W.D.N.Y. 1996); E.E.O.C. Compliance Manual § 8-II (B)(c) ("Title VII . . . prohibit[s] retaliation against someone so closely related to or associated with the person exercising his or her statutory rights that it would discourage that person from pursuing those rights."). While the Second Circuit has not addressed third-party retaliation, it has recognized that Title VII's anti-retaliation provision is broadly drawn, and that courts "must interpret Title VII's anti-retaliation provision in light of Title VII's overall remedial purpose." *Deravin v. Kerik*, 335 F. 3d 195, 203-04 (2d Cir. 2003).

While recognizing third-party retaliation claims is consistent with the purpose of the anti-discrimination statutes, other legitimate goals caution against expanding protection. *See Fogelman*, 283 F.3d at 569 ("Congress may have feared that expanding the class of potential anti-discrimination plaintiffs beyond those who have engaged in protected activity to include anyone whose friends or relatives have engaged in protected activity would open the door to frivolous lawsuits and interfere with an employer's prerogative to fire at-will employees.").

I need not determine here, however, whether Title VII permits third-party retaliation claims, because even if such claims are available, Genao has not alleged sufficient grounds to support one.

To succeed on a claim of retaliation, a plaintiff must show: (1) that he engaged in activity protected by Title VII; (2) that he was the subject of an adverse employment action; and (3) that there exists a causal link between his protected activity and the adverse action of his

13

employer. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 64 (2d Cir. 1992). For a discrimination claim, a plaintiff must establish: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination. *Swierkiewicz*, 534 U.S. at 510. A plaintiff need not establish a *prima facie* case of discrimination or retaliation to survive a motion to dismiss. *Id.* at 508. He must, however, give the defendant fair notice of what his claim is and "the grounds upon which it rests." *Id.* at 512 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Genao has not stated an actionable adverse employment action. In addition, he has not set forth a plausible nexus between the acts complained of and the protected activity engaged in by his brother that could support a retaliation claim. Accordingly, under a theory of either discrimination or retaliation, his claim fails.

### 2. The Failure to Call Genao

An adverse employment action is defined as a "materially adverse change" in the terms and conditions of employment. *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (internal quotations and ellipsis omitted). There are no bright-line rules in determining whether an adverse employment action occurred, but "not every unpleasant matter short of discharge or demotion" creates an adverse employment action. *Wanamaker v. Columbian Rope Co.*, 108 F. 3d 462, 466 (2d. Cir.

14

1997) (internal quotation and brackets omitted).

Here, Genao expected to be invited to work in mid-March. At a meeting with Melnick in mid-May 2003, she told him that the seasonal jobs were going to run only until June 30, and that no jobs were currently available. She told him that she would call him if work became available. She did not do so, though Genao later discovered that work was available when he ran into Cafaro. Melnick's failure to call does not constitute an adverse employment action. Her failure to call does not alter the "terms and conditions" of Genao's employment. An employee seeking to be hired must make some modicum of effort to secure a job before an employer can be held liable for its failure to hire. Genao made no such effort here. After a single contact with Melnick, Genao did nothing to follow up with her or anyone else in the Department in an attempt to get work. Without such an effort, Genao cannot establish that the alleged failure to call him up when work became available is an adverse employment action that could support a claim of discrimination or retaliation.

Genao also fails to show a plausible link between the protected activity in this case (his brother's filing of a complaint) and the alleged retaliatory act necessary to support a claim of retaliation. Genao has alleged only that his brother was told to report to Melnick to receive his new assignment in November 2001, Compl. ¶ 5, and that Melnick "just happened to be the same person that was hand delivered a copy of a particular truth along with pictures of a hangman's noose displayed on the back of a Departments [*sic*] forestry vehicle." *Id*. Furthermore, almost two years had passed since Genao's brother filed his discrimination claim and was reassigned. *See Richardson v. New York State Dep't of Correctional Servs*, 180 F.3d 426, 447 (2d. Cir 1999) ("two year gap is too wide to support the inference that [plaintiff] was

terminated in retaliation for complaining about discrimination"); *Johnson v. New York Presbyterian Hosp.*, 2001 WL 829868, at *5 (S.D.N.Y. July 20, 2001) (granting motion to dismiss retaliation claim; two-year gap between protected activity and employer's failure to hire). Accordingly, Genao has not stated a discrimination or retaliation claim based on Melnick's failure to call him about possible work.

      3.      <u>The Failure to Extend Employment</u>

In July 2003, Genao ran into Cafaro, who offered him work until the season ended in mid-September 2003. At some point, Genao asked for another 14 weeks of work so he could reach 21 weeks of work and thus collect unemployment. Cafaro laughed at him in front of co-workers and called him a "bum."

Cafaro's "failure" to offer Genao another fourteen weeks of work does not, without more, constitute an adverse employment action. It did not materially alter the terms and conditions of Genao's employment. Genao was not entitled to work longer. He merely hoped to do so. That Cafaro did not help him get enough work to collect unemployment is not an action for which an employer can be held liable, even if Cafaro humiliated Genao in the process.

Genao has also alleged no causal connection between his brother's filing of a complaint and Cafaro's actions that would support a theory of retaliation. Genao has not alleged that Cafaro knew of his brother's complaint, or that it influenced his actions in any way. It is not plausible that Cafaro hired Genao on his own volition in July 2003 only to retaliate against him a few weeks later because Genao's brother filed a discrimination claim two years earlier. Accordingly, Genao cannot state a claim of retaliation or discrimination based on Cafaro's failure to extend his term of work.

16

Rather than alleging an independent discriminatory act, Genao's papers suggest that he included the Cafaro "incident" as evidence that there were jobs available for which Melnick did not call him, and also to support Genao's contention that there was systemic discrimination in the Parks Department. Genao did not allege that Cafaro's act was discriminatory in his EEOC complaint, his complaint in this action, or during the November 12, 2004 hearing in which Genao clarified his complaint. In a Union grievance letter dated October 7, 2003 (weeks after the Cafaro incident occurred), Genao wrote:

> After ten years of continuous service as a seasonal employee, without fail I would receive notice to report to particular location to receive my tour of duty. The tour for the season would give me ample time served in the work force so that I may be eligible to receive unemployment insurance benefits which had been the way I have been sustaining my life. However, this past season *the department* has not afforded me the hours needed in the work force so that I may be eligible to receive unemployment insurance benefits[.]

Compl. Ex. B. (emphasis added).

Genao explained at the November 12 hearing that discrimination in the Parks Department was systemic:

> Mr. Genao: Not only does [the Parks Department] discriminate as far as hirings and promotions, but it discriminates as far how it expends its funds, what parks and what neighborhoods get rebuilt and new playgrounds and whatnot.
>
> The Court: Let's not get too far afield.
>
> Mr Genao: I feel it is all connected, from the head of the parks department, and it goes all the way down to the low level supervisor. . . . [W]hen I worked in District Six there's a playground called Painter playground. It is mostly Caucasian Jewish community in which Painter's playground parks department spent a million dollars building a park house which consists of a men's bathroom, a women's bathroom, and tool shed. The parks

17

> department spent a million dollars to make it. It had exterior lights, it has windows in it, it has an aluminum roof.

Tr. at 13-14.

Genao may disagree with the way the Parks Department allocates its budget. But he has not alleged facts that can support a discrimination claim grounded in the two timely acts that he complains of – Melnick's failure to call him about possible work, and Cafaro's failure to extend his employment. Accordingly, the Parks Department's motion to dismiss is granted.

CONCLUSION

For the foregoing reasons, the Parks Department's motion to dismiss is granted and the case is dismissed. The Clerk of the Court is respectfully directed to close the case.

So Ordered.


John Gleeson, U.S.D.J.


Dated:  May 23, 2005
        Brooklyn, New York